ence for the plaintiff's sister, Helena, by giving her the entire estate, had excluded the plaintiff from a "reasonable share of his estate." If there were no facts explaining this circumstance, it would seem as if the decedent had failed to keep his agreement as to the plaintiff, Otto. Here, however, are to be found circumstances readily explaining the apparent discrimination. The estate was quite small. Helena had remained with the decedent several years after Otto had left him. She had, during the decedent's lifetime, suffered from mental disturbances and had been confined in an insane asylum. She was less fit than Otto to face the world, and more exposed to contingencies which would require the use of such little estate as the testator had. He might well contemplate a recurrence of the mental disorders in Helena, and the need of his whole estate, small as it was, to provide for her care and comfort during her lifetime. In fact, such recurrence has happened, and Helena, having been adjudged an incompetent, is now present in this action by her committee. Any father, having two children, one a sturdy man of full age, and the other a daughter of feeble mind, might have reasonably made a precisely similar disposal of a small estate without being subject to just criticism as having acted unreasonably.

To me it seems that the will of the decedent is not a breach of the agreement sued upon, and that such agreement did not absolutely bind him to give to the plaintiff any definite part of his estate, and so deprive him of the right of making such testamentary disposition of his property as seemed to him "reasonable" under the particular circumstances.

Judgment is directed for the defendant.

---

RECTOR, ETC., OF ST. STEPHENS PROTESTANT EPISCOPAL CHURCH OF CITY OF NEW YORK v. RECTOR, ETC., OF CHURCH OF THE TRANSFIGURATION IN CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department.    January 22, 1909.)

1. APPEAL AND ERROR (§ 837*)—REVIEW—EVIDENCE ERRONEOUSLY RECEIVED.
    Evidence erroneously received in support of a plea to which a demurrer had been sustained will not be considered on review of the case on other grounds.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3275; Dec. Dig. § 837.*]

2. DEEDS (§ 145*)—CONDITIONS AND RESTRICTIONS—CONSTRUCTION.
    A restriction in a deed in the form of a covenant by the grantee that the property conveyed shall never be used for other than church purposes does not constitute a valid and enforceable "condition subsequent," as it reserves no right of re-entry for a breach thereof.
    [Ed. Note.—For other cases, see Deeds, Cent. Dig. § 471; Dec. Dig. § 145.*]

3. PLEADING (§ 304*)—VERIFICATION—OPERATION AND EFFECT.
    The verified petition by the officers of a religious society for leave of court to convey property, in which it is alleged that the price agreed on is its "fair market value," is sufficient to rebut the presumption that the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

property was sold for less than its actual value, arising from a restriction in the deed that the property should never be used for other than church purposes.

[Ed. Note.—For other cases, see Pleading, Dec. Dig. § 304.*]

4. COVENANTS (§ 106*)—USE OF PROPERTY—VALIDITY.

A restriction in a deed in the form of a covenant by the grantee that the property conveyed will not be used for other than church purposes cannot be enforced as a covenant where its enforcement will not benefit the grantor and its violation will not injure him.

[Ed. Note.—For other cases, see Covenants, Dec. Dig. § 106.*]

5. COVENANTS (§ 1*)—CONDITIONS—RESTRICTIONS—CONSIDERATION.

A restrictive covenant in a deed that the property shall not be used for other than church purposes is not supported by a valuable consideration, the property not being appurtenant to any dominant tenement and not beneficial to the grantor; having been inserted merely by the officers of the grantor without authority, and without deduction in price of the property because thereof.

[Ed. Note.—For other cases, see Covenants, Dec. Dig. § 1.*]

6. QUIETING TITLE (§ 7*)—MATTERS SUBJECT TO REFORMATION.

A restrictive covenant in a deed that the property conveyed shall not be used for other than church purposes creates a cloud on the title of the grantee which may prevent the full use and development of the property for church purposes, and, having been inserted without consideration, may be canceled by a court of equity.

[Ed. Note.—For other cases, see Quieting Title, Dec. Dig. § 7.*]

7. QUIETING TITLE (§ 4*)—ADEQUACY OF REMEDY AT LAW.

A court of equity has jurisdiction to cancel a restrictive covenant in a deed as a cloud on title, though the grounds for cancellation would constitute a complete defense to any attempt by action to enforce the restriction.

[Ed. Note.—For other cases, see Quieting Title, Dec. Dig. §. 4.*]

Patterson, P. J., and Laughlin, J., dissenting.

Appeal from Special Term, New York County.

Action by the Rector, Churchwardens, and Vestrymen of St. Stephens Protestant Episcopal Church of the City of New York against the Rector, Churchwardens, and Vestrymen of the Church of the Transfiguration in the City of New York. From a judgment dismissing the complaint on the merits (59 Misc. Rep. 560, 112 N. Y Supp. 403), plaintiff appeals. Reversed.

Argued before PATTERSON, P. J., and McLAUGHLIN, LAUGHLIN, HOUGHTON, and SCOTT, JJ.

Arthur O. Townsend (Frank D. Wynn, on the brief), for appellant. Charles Blandy, for respondent.

SCOTT, J. Plaintiff appeals from a judgment at Special Term in favor of defendant. Plaintiff and defendant are both religious corporations, and both belong to the same religious denomination. The controversy is marked with considerable acrimony, and arises upon a somewhat unusual state of facts. Prior to the year 1897, the Church of the Transfiguration, defendant herein, whose main church edifice was and is in Twenty-Ninth street in the city of New York, also owned a plot of land about 100 feet square in West Sixty-Ninth street, on the rear portion of which stood a small chapel maintained by defendant.

Circumstances were such that in the spring of 1897 defendant desired to sell this plot and chapel, and to devote the proceeds to paying off certain debts and to other corporate purposes. At the same time St. Stephens Church, plaintiff herein, desired to move uptown, and it was proposed that it should purchase the plot of land and chapel in Sixty-Ninth street owned by defendant. The price of $85,000 was agreed upon. The canon law of the Protestant Episcopal Church, to which both plaintiff and defendant belonged, requires the approval of certain diocesan authorities to the relocation of a church, and owing to the vigorous opposition of certain churches in the vicinity of Sixty-Ninth street to the intrusion into the territory of another church, several years elapsed before the consent of the diocesan authorities could be obtained. In the meantime Mr. George W. Quintard, an officer of plaintiff, purchased the property in his own name, paying to defendant $35,000 in cash, and giving a purchase-money mortgage upon the property to secure his personal bond for $50,000. Although Mr. Quintard purchased this property and executed the bond and mortgage as an individual, without any legal authority from plaintiff to act as its agent, or any contract with it respecting the future acquisition of the property, there seems to be no doubt that when he bought it he expected to convey it to plaintiff when the diocesan consent to a relocation had been obtained.

In the summer of 1897 Mr. Quintard expended some $6,000 in repairing the chapel, and on September 21, 1897, entered into a written agreement with plaintiff whereby the latter was to be entitled to purchase the property within two years for the price of $85,000, and meanwhile was to have the use and occupancy thereof for church purposes. The diocesan consent was not obtained until March, 1900. In the meantime plaintiff had expended some $8,000 of its own money in further repairing the chapel, besides assuming liability for the sums expended thereon by Mr. Quintard. In order to make the sale to Mr. Quintard, defendant, as the statute requires, applied to the Supreme Court for its leave. In the petition, signed by the rector and clerk, and verified by the latter, it was stated that defendant had debts amounting to about $30,000, which it desired to pay, and that the price of $85,000 for which it was proposed to sell the property was its "fair market value." The deed from defendant to said George W. Quintard, dated May 27, 1897, and executed by the rector and clerk of defendant, contains the following restrictive clause:

"And the said party of the second part, for himself, his heirs and assigns, doth covenant and agree to and with the said party of the first part, its successors and assigns, that the party of the second part, his heirs and assigns shall not at any time hereafter occupy or use the said premises or any part thereof hereby conveyed, or permit the same to be occupied or used for any purpose other than church purposes only. And it is expressly understood that the said covenant shall attach to and run with the land."

This clause seems to have been inserted in the deed by the officers who executed it, without any direction or authority from defendant. There is no mention of such a proposed restriction in the resolution authorizing the sale adopted by the vestry of defendant, or in the petition presented to the Supreme Court stating the proposed terms of sale and

asking the leave of the court to carry it out, nor is any such restriction contained in the purchase-money mortgage taken back by defendant. When Mr. Quintard proposed to convey the property to plaintiff, his deed, as tendered, contained a similar restriction. It appears that plaintiff's officers then for the first time learned that Mr. Quintard's title was incumbered by such a covenant, and at first demurred to accepting a deed containing a like covenant, but finally accepted the deed as tendered, including the restrictive covenant.

The neighborhood in which the church is situated has greatly increased in population, and the attendance at the church has steadily increased, so that, after putting in all the additional sittings possible, the plaintiff finds itself hampered in carrying out its church work for lack of accommodations, and it desires to increase the size of its edifice. To do this it must borrow money. The property has increased in value since its purchase from defendant in 1897, and plaintiff is now assured that it can borrow upon the property, at a less rate of interest than it is now paying defendant, enough money to pay off defendant's mortgage of $50,000 as well as to erect the needed additions to and enlargement of the church edifice, provided it can be relieved of the restrictive covenant above quoted. But so long as that covenant stands as an apparent burden upon the title a new loan cannot be negotiated, for the restricted use to which the property is apparently subjected destroys its market value. Mr. Quintard has released the plaintiff from the covenant so far as concerns the deed which he executed, but the covenant in the deed from defendant to Quintard still stands of record. For a long time plaintiff found great difficulty in meeting its interest payments to defendant, and is now in arrears for interest for a considerable amount. As early as 1901, defendant was importuned to reduce the interest rate, but has steadily refused to consider such a request. Plaintiff has also for some time requested defendant to release the property from the restrictive covenant in order that money could be raised to pay off the present mortgage and interest in arrears, and obtain funds wherewith to enlarge the church edifice. These requests have also been steadily refused, and in no gentle terms.

It is argued at length on defendant's brief, and some testimony was erroneously admitted to sustain the plea, that the covenant was inserted because of a religious sentiment against permitting the property which had once been used for church purposes to ever be applied to any secular use, and that, in consequence of the restrictions placed upon its use, the property was sold to Mr. Quintard at less than its real value. This evidence was irrelevant to any issue presented by the pleadings as they stood when the case was tried. Such a defense was attempted to be set up, but was demurred to for insufficiency and the demurrer sustained, and no appeal was ever taken, or is now taken, from the judgment so sustaining the demurrer. That defense was therefore out of the case, and no evidence in support of it should have been received. Having been improperly received, it is our duty to ignore it. And, whatever may have been the original reason for inserting the covenant, the only reason now given for insisting upon its retention, or that has been given during all the correspondence between

the parties, is the purely commercial one that defendant would not release the covenant except upon the payment of a sum of money, the amount being generally fixed at $15,000, with the suggestion of a possible concession to a somewhat smaller sum. In the meantime the defendant has begun an action at law for the recovery of the debt of $50,000. Why it has not foreclosed the mortgage, instead of suing at law for the debt, can only be conjectured. It is suggested, however, that if the property were sold under the mortgage, which contains no restrictive covenant, the whole value of the property might be expected to be realized, while if sold under execution no one could afford to buy it at any fair price except defendant, who could then release the covenant and realize the full value upon a resale. The defendant owns no other property in the neighborhood, its church edifice being about two miles distant.

The plaintiff seeks a judgment that the defendant be required to execute a release of the restrictive covenant, or be perpetually enjoined and restrained from seeking to enforce said covenant, and that upon such release, and the payment of the mortgage debt and interest, the mortgage be satisfied and discharged. The plaintiff insists in the first place that the covenant is one which can never be enforced by defendant, either by an action for damages for its breach, or by injunction to prevent a breach. In Equitable Life Assurance Soc. v. Brennan, 148 N. Y. 661–671, 43 N. E. 173, the Court of Appeals, after remarking that it might not be possible to harmonize all the authorities in this country and England on the subject of negative easements, proceeded to state a few general rules which are well settled, one of which is that there must be found somewhere the clear intent to establish the restriction for the benefit of the party suing or his grantor. An indispensable element of an action to enforce such a covenant is that its enforcement will benefit the party suing, or that its violation will injure him, and that he is the party for whose benefit the covenant was made. The violation of the covenant in the present case could not damage the defendant in any legal sense, nor could its enforcement benefit it, for it stands admitted by the pleadings that defendant owns no property in the vicinity of plaintiff's property. As it stands, it is a mere naked covenant, inserted in the deed to Quintard, without authority of defendant, supported by no valuable consideration, and appurtenant to no dominant tenement, and is of no benefit to defendant unless it can be used as a weapon in terrorem to compel the payment of cash consideration for its release. We say that it is supported by no valuable consideration advisedly. As has been pointed out, the evidence that the property was sold at less than its real value must be disregarded as irrelevant, and while it is true that the insertion of a restrictive covenant in a deed will sometimes justify a presumption that the property was, for that reason, sold for less than its unrestricted value, we consider that such a presumption is rebutted in the present case by the sworn petition presented to the court wherein it is stated that the price by which the property was sold to Quintard was its fair market value, for we cannot assume that the officers of a religious society willfully swore falsely to mislead the court upon a vital and material point. The judgment below was based upon, and is now

sought to be sustained upon, the authority of a line of cases in which a restrictive condition subsequent was enforced. Those cases have no application, because, whatever may be the nature of the restriction in the present case, it is not a condition. It lacks the vital feature of a condition in that it reserves no right of re-entry for a breach. To create a condition, in the absence of words of re-entry and forfeiture, the words "upon condition," or "provided always," or other equivalent words must be used. Gibert v. Petlier, 38 N. Y. 165, 97 Am. Dec. 785. No such words are to be found in the present case. On the contrary, the word "covenant" is expressly used, and no one could spell out of the language of the restriction any reserved right of re-entry or forfeiture. The case of a condition differs also from such a covenant as is involved in this case, because the right of re-entry confers a legal interest to support an action for the enforcement of this condition. Much stress is laid by the defendant, in the brief, upon its desire to uphold the covenant for the purpose of advancing the Christian religion. Apart from the fact that no such issue is raised by the pleadings, the argument finds its obvious answer in the often expressed willingness of the defendant to release the covenant for a money consideration. And it is not apparent that it will tend to advance the propagation of religion to hamper the growth and development of a Christian church by insisting upon a covenant which prevents such growth on the one hand, and secures no benefit to defendant on the other. We think, therefore, that it clearly appears from the undisputed evidence that the covenant from which plaintiff seeks to be relieved could not be enforced by defendant either at law or in equity. It is made quite clear by the evidence, and we can see no reason to doubt its sincerity, that the sole purpose of the plaintiff in seeking to be rid of the covenant as a cloud or incumbrance on its title is that it may be put in a position to extend and expand its church work. The removal or release of the restrictions would leave plaintiff in the same position as to selling its property that practically every other church in the city of New York is in. That is to say, no sale or mortgage can be made without the consent of the church authorities and of the Supreme Court. There can be no doubt that the restrictive covenant in the deed from defendant to Quintard casts a cloud upon plaintiff's title to its real estate which effectually prevents the full use and development of the property for church purposes, and we think that it is equally clear that defendant has no such legal interest in the preservation of the restriction that it could prove any damages if it were violated, or restrain such violation by injunction.

It is objected that the plaintiff is not entitled to equitable relief of the nature sought in this action, but that, even assuming that the covenant is unenforceable, plaintiff must wait until some attempt to enforce it is made by defendant. The jurisdiction of equity to entertain an action to remove or cancel a cloud on title, notwithstanding there may be a complete defense to any attempt to enforce it, is of long standing and is well established. Ordinarily it is invoked when the cloud consists of some instrument dehors the plaintiff's chain of title, like an infant's deed or a fraudulent mortgage, or an illegal tax assessment. No reason is perceived, however, why the same jurisdiction may not be invoked,

in a proper case, to cancel a cloud imposed upon the free use and enjoyment of the property, which, although contained in one of the deeds constituting the chain of title, is of such a nature that its elision from the deed will in no wise affect the devolution of title through the instrument. It is true that no case has been found where this particular relief, under similar circumstances, has been awarded, but it is equally true that no similar case has been found wherein such relief has been refused, and it is the boast and strength of equity jurisdiction that its rules and forms are so elastic that its decrees may be molded to apply to any case to which the settled principles of equity ought to be applied.

It is also objected that no equitable relief should be awarded to the plaintiff in this action because, even if the covenant is not void upon its face, its invalidity arising from the lack of enforceable interest on the part of defendant will necessarily appear in any proceeding taken to enforce the covenant. It is doubtful if this is strictly true, but, even if it is, it is not necessarily an answer to plaintiff's demand. It is true that the rule thus contended for is generally applied in actions to remove clouds on title, but it is a rule which affects not the jurisdiction of the court of equity, but merely the exercise of its discretion in exercising that jurisdiction. In Hamilton v. Cummings, 1 Johns. Ch. 517, Chancellor Kent reviewed at length and with great care the English authorities relating to the power of a court of equity to compel the cancellation of instruments which might be enforced by an action at law, and to which there were defenses which might or might not be available at law. He concluded:

"That the weight of authority and the reason of the thing are equally in favor of the jurisdiction of the court, whether the instrument is or is not void at law, and whether it be void from matter appearing on its face, or from proof taken in the cause, and that these assumed distinctions are not well founded."

He proceeded to sum the whole matter up as follows:

"But while I assert the authority of the court to sustain such bills, I am not to be understood as encouraging applications where the fitness of the exercise of the power of the court is not pretty strongly displayed. Perhaps the cases may all be reconciled on the general principles that the exercise of this power is to be regulated by sound discretion, as the circumstances of the individual case may dictate; and that the resort to equity, to be sustained, must be expedient, either because the instrument is liable to abuse from its negotiable nature, or because the defense, not arising on its face, may be difficult or uncertain at law, or from some other special circumstances peculiar to the case, and rendering a resort here highly proper, and clear of all suspicion of any design to promote expense and litigation. If, however, the defect appears on the bond itself, the interference of this court will still depend on a question of expediency and not on a question of jurisdiction. It may sometimes become essential to the perfect and tranquil enjoyment of private right that this most important branch of equity power should be exercised in the one case as well as the other."

This opinion has been often cited, and always with the respect due to the recognized authority of its author as an equity judge. In Field v. Halbrook, 6 Duer, 597, it was held that a court of equity may entertain an action to remove a cloud on title when the instrument sought to be canceled affects real estate and would be inoperative if allowed

to remain uncanceled, and yet casts a cloud upon the plaintiff's title to the land to which the instrument refers. In McHenry v. Hazard, 45 N. Y. 580, the Court of Appeals held that a court of equity had power to cancel nonnegotiable instruments, notwithstanding there might be a defense at law, if the instruments were such that a hostile or unjust claim was or might be asserted, and that the exercise of this jurisdiction depended upon the sound discretion of the court, depending upon the special circumstances of the particular case. It was further held that, even if he had a defense at law, the plaintiff was not compelled to await the commencement of an action at law. As it seems to us the present case is one in which the exercise of a sound discretion requires us to assume jurisdiction to cancel the restrictive covenant. It is being used as a means of annoyance and oppression, not to compel compliance with its restrictions, but to force the plaintiff to pay a cash consideration for its release; that defendant has no legal interest in its enforcement; that defendant has declined to take action with a view of having the validity of the covenant judicially determined, and the plaintiff cannot force affirmative action on the part of the defendant without abandoning the use of its property for church purposes, and attempting to devote it to secular uses, which it is unwilling to do; and although the covenant is unenforceable, yet it prevents the acquisition by plaintiff of means to reasonably extend its facilities for carrying on its work as a church, and prevents it from raising funds to meet the defendant's action for the amount of the mortgage debt, an action which, if prosecuted to judgment, will inevitably deprive plaintiff of its property and end its usefulness as a church. These special circumstances, peculiar to this particular case, bring it clearly within the reason and authority of the cases to which attention has been called, and appeal strongly to the equitable jurisdiction of the court.

The judgment appealed from should be reversed, and a new trial granted, with costs to appellant to abide the event.

McLAUGHLIN and HOUGHTON, JJ., concur.

PATTERSON, P. J. (dissenting). I am unable to concur in the reversal of this judgment, and am of the opinion that the cause was properly decided at the Special Term. The plaintiff seeks to have the court obliterate from a deed a covenant which was not simply personal between the parties to that deed, but which was solemnly declared to be one which ran with the land. It placed a restriction upon the use of property. The transfer of the property was really made by one religious corporation to another, and restricted the use of the property to religious purposes or church uses. While the deed from the defendant was originally made to Mr. Quintard, it is nevertheless conceded that that gentleman held the title only until the permission of the diocesan authorities of New York to transfer the property could be obtained.

It is indisputable that, by the delivery to and acceptance of the deed by the plaintiff, it became bound to the observance of that covenant. The court is now asked to destroy it because it is inconvenient to the plaintiff to be bound by it. There is no adjudicated case which is

authority for this action, nor, in my judgment, can it be supported by principle. The argument of the plaintiff seems to proceed upon the theory that the covenant is a cloud upon title, and therefore may be removed by a court of equity. A covenant may be an incumbrance, and courts of equity have power to remove adverse titles and incumbrances which affect title; but the essential condition to the exercise of jurisdiction in such cases is, and always has been, that the outstanding title or incumbrance, although in form valid, must as matter of fact be invalid.

I am not prepared to assent to the proposition that a covenant running with the land, which is wrought into the very deed by which the plaintiff claims title, can be said to be an incumbrance which is invalid and which a court of equity should interfere to remove. The majority of the court appear to be of the opinion that authority is to be found for this action in what was decided by Chancellor Kent in Hamilton v. Cummings, 1 Johns. Ch. 517. That case merely decided that the court had power to order a bond or other instrument to be delivered up to be canceled, whether the instrument is or is not void at law, or whether it be void on the face of it or by matters shown by proofs in the case. But the court did not decide, and it has never been decided, that a court of equity could strike out from a valid instrument a covenant or a condition which by the express agreement of the parties was made a part of their contract. The question does not arise now with reference to a court of equity enforcing this covenant. It is true that the cases ordinarily relating to restrictive covenants are those arising in connection with the interests of neighborhood property owners, and this is a simple case of one religious corporation making a deed of property to another religious corporation with the intent and object of having the property conveyed used only for religious purposes; but I am unable to see why such a covenant could be destroyed by a court of equity simply because of inconvenience to the grantee, who desires to avoid the effect of that covenant in order that the property may be made more available to it commercially. Courts of equity are not constituted for the purpose of destroying covenants. They may refuse to enforce them when equitable considerations are presented such as appeared in the Thatcher Case, but covenants, provisions, and conditions of deeds are not to be expunged, and virtually a new deed made by the court, contrary to the agreement of the parties deliberately entered into, as in this case.

I therefore dissent.

LAUGHLIN, J., concurs.